UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
EASTERN DIVISION


RONDEZE HARRIS, MELVIN HARRIS &
DIANE HARRIS                                                                              PLAINTIFFS


V.                                                                                        NO. 1:03CV621


DOLPH BRYANT IN HIS OFFICIAL CAPACITY
AS SHERIFF OF OKTIBBEHA COUNTY,
SHANK PHELPS IN HIS CAPACITY OF DEPUTY
SHERIFF OF OKTIBBEHA COUNTY &
OKTIBBEHA COUNTY, MISSISSIPPI                                                             DEFENDANTS


**ORDER**

This cause comes before the court on the motion **[26-1]** of defendants Dolph Bryant and Shank Phelps, in their official capacities as Sheriff and Deputy Sheriff of Oktibbeha County, Mississippi, as well as Oktibbeha County itself, seeking summary judgment, pursuant to Fed. R. Civ. P. 56. Plaintiffs have responded in opposition to the motion, and the court, having considered the memoranda and submissions of the parties, concludes that the motion is well taken and should be granted.

Plaintiffs filed this 42 U.S.C. § 1983 action seeking recovery for alleged due process violations arising out of, *inter alia*, the alleged false arrest and malicious prosecution of Rondeze Harris by the Sheriff's Department of Oktibbeha County. Harris was arrested in June, 2001 for suspicion of his involvement in the murders of Michael White and Derrick Brantley. White and Brantley had been reported missing on June 13, 2001, and their bodies were discovered on June 22, 2001 at the Baptist Church cemetery in rural Oktibbeha County. Although the bodies were

badly decomposed, Sheriff's deputies could immediately discern that the victims had been shot in the head and their bodies dragged into the woods.

Rondeze Harris was (and is) considered a suspect in the murders, based in part upon the fact that witnesses reported seeing Harris speaking with White and Brantley in the parking lot of Cheezland Records on 6 p.m. of the evening of their disappearance. Soon thereafter, Harris was seen leaving the parking lot in his gold Daewoo automobile, and White and Brantley were observed leaving in White's green Pontiac. White and Brantley were not seen alive again. The county asserts that a vehicle generally matching the description of Harris' vehicle was observed entering a Baptist cemetery on the night of the murders, along with a green vehicle matching the description of the victims' vehicle. Plaintiffs dispute this assertion, however, arguing that a witness actually saw a brown vehicle alongside the green vehicle, rather than a gold one. Sheriffs' deputies interviewed Harris on several occasions after the murder, and the county asserts that Harris further aroused suspicion by making inconsistent statements during these interviews.

In investigating Harris, deputies obtained three search warrants from Justice Court Judge Gillis, based upon facts submitted to the judge by deputies. As discussed *infra*, plaintiffs argue that these facts included inaccuracies and misstatements designed to make Harris appear guilty. During a search of Harris' house, police found blood on his Daewoo vehicle, and Harris was arrested shortly thereafter. Harris was charged with two counts of capital murder (later reduced to murder) and jailed for over a month. However, testing subsequently revealed that the blood on Harris's vehicle was actually animal blood. The case was presented to the Oktibbeha County grand jury, but no bill of indictment was returned against Harris. Harris is not presently charged

with the murders of White and Brantley, although he is still considered a suspect in their murders.

As noted previously, plaintiffs bring this action pursuant to 42 U.S.C. § 1983, which provides a civil remedy against for certain breaches of the U.S. Constitution and/or federal law which are committed under color of state law. *Calhoun v. Hargrave*, 312 F.3d 730, 734 (5th Cir. 2002). In the court's view, the only evidence which arguably suggests the existence of fact issues regarding whether a Constitutional or federal law violation occurred in this case relates to false information which was allegedly submitted to obtain search and arrest warrants from Judge Gillis. A municipality is not deemed to have committed a Constitutional violation merely for having made an incorrect decision as far as whether to seek a search or arrest warrant against a particular suspect. Moreover, plaintiffs themselves concede that the police had sufficient information to consider Harris a "person of interest" or even a suspect in the murders. As such, if the court were simply faced with evidence that the county had arguably been negligent in seeking search and/or arrest warrants in this case, then such would very likely not suffice to establish Constitutional violations so as to support a § 1983 action.[1] However, if the county

---

[1] The U.S. Supreme Court has declined to find Constitutional violations based upon merely negligent conduct in other contexts. In *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 663 (1986), for example, the Supreme Court held that:
> The Due Process Clause was intended to secure an individual from an abuse of power by government officials. Far from an abuse of power, lack of due care, such as respondent's alleged negligence here, suggests no more than a failure to measure up to the conduct of a reasonable person. To hold that injury caused by such conduct is a deprivation within the meaning of the Due Process Clause would trivialize the centuries-old principle of due process of law.

While *Daniels* arose in a somewhat different legal context, it does highlight the Supreme Court's reluctance to impose liability for Constitutional violations based upon merely negligent acts. Moreover, plaintiffs' § 1983 theories all require a Constitutional violation, including their malicious prosecution theory. *See Castellano v. Fragozio*, 352 F.3d 939 (5th Cir. 2003). Any

itself, either through its own policies or the actions of its official policymaker Sheriff Bryant, knowingly or recklessly submitted false information to Judge Gillis in order to obtain search and/or arrest warrants in this case, then such might well suffice to establish the existence of a Constitutional violation in this case. *See Freeman v. Bexar County*, 210 F.3d 550, 553 (5th Cir. 2000).

In his deposition, Deputy Phelps testified that, to the best of his knowledge, an "underlying facts and circumstances" sheet was submitted to Judge Gillis in support of the request for a search warrant. Deputy Phelps testified that he did not prepare the sheet and that he was not present when it was presented to Judge Gillis.[2] Deputy Phelps testified that he believed that the sheet was actually prepared by Deputy Tommy Whitfield, who is not a defendant in this action. The facts and circumstances sheet, attached as an exhibit to plaintiff's response to the motion for summary judgment, provides as follows:

UNDERLYING FACT AND CIRCUMSTANCES

> On Wednesday June 13, 2001, Derrick Brantley and Michael White were discovered missing. The deceased bodies of both subjects were found just before midnight on June 21, 2001 at the Sixteen Section Missionary Baptist Church Cemetery. Both bodies were placed in the woods and the car that they were last seen in, a 1997 green Pontiac Grand Am, was driven into the wood line near one of the bodies. One of the resident that live [sic] near the cemetery said that he saw a small gold or beige car drive into the cemetery around the same time that the green Grand Am went into the cemetery. One of the last people seen with the victims was Rondeze Harris. Harris drives a small gold Daewoo car tag # GHD994 and Harris was the last person that they were seen talking with. Harris said that he went to Cheezland to buy dope from Derrick and Michael and he was

---

state law claims which plaintiffs might have wished to bring would be barred by numerous provisions of the Mississippi Tort Claims Act.

[2]As noted *infra*, however, Deputy Phelps' signature does appear to be located at the bottom of the facts and circumstances sheet.

> supposed to meet them later to pick up the dope. The last time the victims were seen alive was at Cheezland Studio on Marrilyn Ln. Witnesses at Cheezland said that Rondeze pulled up outside in his Daewood and talked with Michael and Derrick. The witnesses said that Rondeze left and then Derrick and Michael left behind him in the green Grand Am.

The sheet appears to bear the signatures of Deputies Phelps and Whitfield, as well as the signature of Judge Gillis, dated 6/25/2001.

Plaintiffs argue that at least two false pieces of information were submitted to Judge Gillis in order to obtain warrants and that at least one piece of exculpatory information was omitted by deputies. The first of the allegedly false statements relates to the color of the vehicle which was observed entering the cemetery where the victims' bodies were found. In their depositions, Deputy Phelps and Sheriff Bryant each testified that a witness told investigators that he saw a smallish "brown" or "brownish" vehicle entering the cemetery along with a green vehicle similar to that driven by the victims. In the sheet submitted to Judge Gillis, however, the vehicle accompanying the green vehicle was described as a "gold" or "beige" vehicle. Plaintiffs argue that this fact suggests that deputies deliberately attempted to misstate the evidence in order to implicate Harris, who drove a gold vehicle.

The second piece of allegedly false information relates to statements made by Harris during an interview with deputies. In seeking a search warrant, deputies informed Judge Gillis that Harris had told them that he "went to Cheezland to buy dope from Derrick and Michael and he was supposed to meet them later to pick up the dope." Plaintiffs submit that, in reality, Harris only told deputies that he had bought marijuana from White on one occasion in the past, and they assert that Harris made no statements about having bought drugs on the day in question. Finally, plaintiffs argue that deputies failed to inform Judge Gillis that Harris had told them that he had

5

attempted to visit White at his house after the murder and left messages for him, facts they deem to be exculpatory.

The court concludes that the aforementioned evidence arguably suffices to establish fact issues as to whether Deputies Whitfield and Phelps committed, in their individual capacities, Constitutional violations for the purposes of a § 1983 action. It is true that, in this circuit, "even an officer who acted with malice in procuring the warrant or the indictment will not be liable if the facts supporting the warrant or indictment are put before an impartial intermediary such as a magistrate or a grand jury, for that intermediary's 'independent' decision 'breaks the causal chain' and insulates the initiating party." *Smith v. Gonzales*, 670 F.2d 522, 526 (5th Cir.1982). However, the Fifth Circuit has also emphasized that:

> the chain of causation is broken only where all the facts are presented to the grand jury or magistrate and the malicious motive of the officer does not lead him to withhold any relevant information. Any misdirection of the magistrate or the grand jury by omission or commission perpetuates the taint of the original official behavior.

*Hand v. Gary*, 838 F.2d 1420, 1428 (5th Cir.1988).

In light of the foregoing authority, if plaintiffs were suing Deputy Phelps in his individual capacity, then the court would consider whether fact issues existed regarding any qualified immunity enjoyed by that defendant. However, from a legal perspective, the crucial fact in this case is that plaintiffs have chosen to proceed solely against Deputy Phelps and Sheriff Bryant in their *official* capacities. As such, this case is for all practical purposes a suit against the county itself, which will be solely responsible for satisfying any monetary award. By proceeding solely against the county, plaintiffs have concentrated their efforts against the "deep pockets" defendant, but they have likewise made their burden of proof more difficult.

Indeed, as plaintiffs are well aware, the U.S. Supreme Court has established rather difficult hurdles for plaintiffs to surmount in obtaining monetary recovery against a municipality under § 1983.  In order to recover against the county under § 1983, plaintiffs are required to demonstrate that any constitutional violations resulted from an official county policy or custom. *Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694, 98 S. Ct. 2018, 2037-2038, 56 L. Ed. 2d 611 (1978).  As to Deputy Phelps, plaintiffs have submitted no proof that this defendant's actions were made pursuant to any official county policy or custom.  Thus, regardless of whether these actions violated Constitutional standards, the county may not be held liable therefore in this case.   A different analysis applies with regard to Sheriff Bryant's actions, however.  Plaintiffs note that a county may be liable for a single action of a sheriff acting as the official policymaker for the county regarding the matter in question, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), and they argue that the actions of Sheriff Bryant so bind the county in this case.

In the court's view, the only manner in which plaintiffs might establish that a county policy or custom resulted in any Constitutional violations in this case is by demonstrating that Sheriff Bryant, in his capacity as official policymaker, committed such violations.  The parties have submitted deposition excerpts on this issue, and they indicate that Sheriff Bryant supervised, in a somewhat vague sense, the presentation of the proof before Judge Gillis. However, Sheriff Bryant testified on direct examination that he had a limited role in this regard:

> Q: Tell me what part of this investigation that you played a role in in any way, shape or form.
> A: Very little. I did very little in this investigation other than being the boss of the men who were conducting the investigation, and they would come and ask me could they do certain things, or ask me what I thought about this or that, and then

7

they would talk about it and they would go on about their work.

Moreover, when asked whether certain specific information was shared with Judge Gillis, Sheriff Bryant testified "I don't have any idea. I don't have any idea of what was related to Judge Gillis. I thought I made that clear."

On cross-examination, Sheriff Bryant would not agree that he authorized the obtaining of the search warrants:

> Q: When they obtained the search warrants and the subsequent arrest warrant for Rondeze Harris, that was authorized by yourself?
> A: I don't think that's a fair representation of the facts. I didn't never tell them that they could or they couldn't do it. I would look at their probable cause, and I agreed with them that they had probable cause.
> Q: Okay.
> A: And I told them to publish that to the Justice Court judge. And if he agreed and issued a warrant, then that was fine.

In the court's view, the aforementioned testimony establishes, that Sheriff Bryant, at most, may have merely provided vague directions to his deputies, but there is no evidence before the court that Sheriff Bryant himself either knowingly or recklessly submitted false evidence before Judge Gillis in order to obtain warrants. Indeed, to reiterate, Sheriff Bryant testified that he had "no idea" what information was relayed to Judge Gillis, and plaintiffs have submitted no evidence which might cast doubt upon this testimony. Plaintiffs have submitted no evidence which might create fact issues regarding the county's (as opposed to individual deputies') potential liability in this case, and defendants' motion for summary judgment is therefore due to be granted.

In light of the foregoing, it is hereby ordered that defendants' motion [26-1] for summary judgment is **granted**.

A separate judgment will be issued this date in accordance with Fed. R. Civ. P. Rule 58.

**SO ORDERED**, this the 19th day of April, 2005.

    /s/ Michael P. Mills
**UNITED STATES DISTRICT JUDGE**